JUDGE ENGELMAYER

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>          v.<br><br>JPMORGAN CHASE & CO. and JPMORGAN CHASE BANK, N.A.,<br><br>             Defendants. | **CIVIL ACTION NO.**<br><br>**COMPLAINT**<br>**CLASS ACTION**<br><br><u>**ECF CASE**</u><br><br>12 CV 6659<br><br>**JURY TRIAL DEMANDED** |



AUG 3 0 2012
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 3

III.    PARTIES ............................................................................................................ 4

        A.      Plaintiff ................................................................................................... 4

        B.      Defendants ............................................................................................. 4

IV.     JPMORGAN IS A CUSTODIAN AND FIDUCIARY TO LAMPERS ........... 5

        A.      JPMorgan Has Acted As LAMPERS' Custodian Since 2005 ................ 5

        B.      JPMorgan is a Fiduciary of LAMPERS ................................................. 6

V.      DEFENDANTS SECRETLY MANIPULATE FX TRADES IN ORDER
        TO   UNLAWFULLY   PROFIT   AT   THE   EXPENSE   OF   THEIR
        FIDUCIARY CLIENTS ...................................................................................... 7

        A.      JPMorgan Touts the Benefits of Its Standing Instructions Program ...... 7

        B.      JPMorgan Secretly Manipulates FX Trades ........................................ 8

VI.     JPMORGAN'S     CLIENTS     COULD     NOT     DISCOVER     ITS
        MISCONDUCT ................................................................................................. 11

VII.    CLASS ACTION ALLEGATIONS .................................................................. 12

VIII.   CLAIMS FOR RELIEF .................................................................................... 14

IX.     PRAYER FOR RELIEF ................................................................................... 23

X.      JURY TRIAL DEMANDED ............................................................................ 24

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), individually and on behalf of all others similarly situated, alleges the following against Defendants JPMorgan Chase & Co. ("JPM") and JPMorgan Chase Bank, N.A. ("JPMorgan" or the "Bank" and, collectively with JPM, the "Defendants") based upon information and belief and the investigation of counsel,[1] except as to the allegations pertaining specifically to LAMPERS that are based on personal knowledge.  This suit is brought on behalf of a Class of all public and private pension funds and any other trusts or funds for which JPMorgan served as the custodial bank and executed foreign exchange ("FX") transactions on an "indirect" basis (or based on "standing instructions") from 2005 through the filing of this Complaint (the "Class Period"). The action also asserts claims on behalf of any employee benefit plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA") for which JPMorgan served as the custodial bank and executed FX transactions on an "indirect" basis (or based on "standing instructions") during the Class Period (the "ERISA Sub-Class").

## I.   <u>INTRODUCTION</u>

1.     This action arises from JPMorgan's scheme to enrich itself at the expense of Plaintiff and the Class by manipulating FX transactions.  Specifically, while serving as the custodian bank for LAMPERS and other members of the Class and acting as their agent and fiduciary, JPMorgan failed to credit LAMPERS and the Class with FX transactions executed at prevailing prices.  Instead, JPMorgan recorded the FX transactions for its clients at unfavorable rates, and booked for itself the difference between the market rate and the rate assigned to LAMPERS and the Class.

---

[1]     Counsel's investigation included, among other things, a review of: (i) JPM's public documents, conference calls and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases; and (ii) newspaper articles and other publications concerning Defendants and/or practices relating to foreign exchange currency trading.  References to the "Custody Agreement" are to the agreement dated July 28, 2005 between LAMPERS and JPMorgan.  Unless otherwise noted herein, all emphases are added.

2.       Indeed, an analysis of LAMPERS' FX transactions executed by JPMorgan during the Class Period demonstrates that *36% of the sampled trades were priced near the absolute worst FX rate* during the sample period. Moreover, *over 79% of LAMPERS' sampled trades were priced at rates that were unfavorable to LAMPERS*. In addition, JPMorgan booked numerous FX trades for LAMPERS at prices that were *lower than the worst possible rate* that day. As demonstrated by this analysis, JPMorgan systematically overcharged LAMPERS, and profited by retaining for itself the spread between the actual FX rate when a trade was executed and the "rate" charged to its clients. On information and belief, JPMorgan similarly manipulated FX transactions for the Class. JPMorgan retained those undisclosed profits in violation of its fiduciary and contractual obligations to LAMPERS and the Class.

3.       The FX transactions at issue in Defendants' scheme were managed by JPMorgan on behalf of JPMorgan's custodial clients and executed on an "indirect" basis (also known as FX transactions based on "standing instructions"). JPMorgan's indirect FX program is branded by the Bank as "AutoFX." Defendants perpetrated their FX trading scheme throughout the Class Period.

4.       Each member of the Class, including LAMPERS, executed a custody agreement with JPMorgan that, among other things, appointed JPMorgan to act as a custodian of assets. The agreements also dictated the compensation JPMorgan was entitled to receive for any services provided to its custodial clients. As a custodian, and as the agent appointed to execute FX transactions for its custodial clients, along with JPMorgan's superior knowledge of all aspect of clients' FX trading including the compensation the Bank stood to make on each transaction, JPMorgan assumed a fiduciary obligation to safeguard the assets it holds in trust and to execute all services performed for its custodial clients by acting in their best interests. The execution of

2

custodial clients' FX transactions is a component of the custodial services JPMorgan provided to LAMPERS and the Class.

5.     JPMorgan's scheme was predicated on the structure of AutoFX, which required clients to place their trust in JPMorgan and, specifically, to permit the Bank to control all aspects of its clients' FX trading, including the timing of the trade and the "rate" being charged.

6.     While JPMorgan represented that AutoFX purportedly reduced client costs by outsourcing FX transactions to the Bank, in truth, participation in the JPMorgan indirect FX program caused LAMPERS and the Class to pay fictitious FX rates that were often the *absolute worst rates* available over any trading day.  The FX "rates" charged by JPMorgan were not based on the price currencies were trading when a trade was executed but appear to have been arbitrarily selected by the Bank *after* trades were executed and *after* JPMorgan observed post execution movements in the FX market.  JPMorgan's FX scheme can be compared to a horse race, where clients asked JPMorgan to pick the best horse and instead, JPMorgan put money on each horse, waited for the race to finish and then handed the losing tickets to its clients and kept the winners for itself.  JPMorgan's scheme allowed it, in violation of its contractual and fiduciary obligations, to extract hundreds of millions of dollars in illicit risk free profits from its clients under the guise of FX trading.  JPMorgan then funneled a portion of the illicit profits it extracted from its scheme to JPM.

7.     LAMPERS brings this action to recover losses suffered by it and the Class based on the scheme detailed herein, which Defendants perpetrated in violation of, *inter alia*, their fiduciary and contractual obligations.

## II.   JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in

which: (1) there are hundreds (if not thousands) of proposed Class members; (2) more than two-thirds of the proposed Class are believed to be citizens of States other than that of the Defendants; and (3) the claims of the proposed Class exceed $5,000,000 in the aggregate. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2) and 29 U.S.C. § 1132(e)(2). A substantial part of the events or omissions giving rise to the claims occurred within this district. Also, Defendants transact business in this district, maintain substantial operations within the state of New York and/or have consented to the jurisdiction of federal courts within the state of New York such that the Court has personal jurisdiction over the Defendants.

## III.   PARTIES

### A.     Plaintiff

10.     LAMPERS is a defined benefit pension fund and retirement system created for the purpose of providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana. JPMorgan has provided custodial services to LAMPERS since at least 2005. JPMorgan's provision of custodian services to LAMPERS and the Class include the execution of FX trades on behalf of LAMPERS and the Class. Executing such trades required JPMorgan to convert U.S. dollars ("USD") into foreign currency, and vice versa, in connection with transactions in foreign securities and currencies.

### B.     Defendants

11.     Defendant JPM is a financial holding company that provides various financial services worldwide. JPM trades on the NYSE under the ticker symbol "JPM" and its principal executive offices are located in New York, New York. JPM is the parent of JPMorgan. JPM's

business activities are organized into six segments: Investment Bank, Retail Financial Services, Card Services, Commercial Banking, Treasury & Securities Services ("TSS"), and Asset Management.   JPM's principal assets and sources of income come from its subsidiaries, including JPMorgan.  According to JPM's Form 10-K for the year ended December 31, 2011 (filed with the SEC on Feb. 29, 2012) ("JPM 2011 10-K"), JPM had $1.9 trillion in assets under management and $17 trillion in assets under custody and administration as of December 31, 2011.  JPM's SEC filings show that JPM recorded over $4 billion in FX revenue from TSS between 2005 and 2011.

12.     Defendant JPMorgan is a national association that constitutes the consumer and commercial banking subsidiary of JPM.  JPMorgan provides the custodial and FX services at issue in this action to LAMPERS and the Class.  JPM's SEC filings identify JPMorgan as a "principal bank subsidiar[y]" of JPM.  *See e.g.,* JPM 2011 10-K.

## IV.   <u>JPMORGAN IS A CUSTODIAN AND FIDUCIARY TO LAMPERS</u>

### A.     **JPMorgan Has Acted As LAMPERS' Custodian Since 2005**

13.     JPMorgan and LAMPERS entered into the Custody Agreement on July 28, 2005.

14.     The Custody Agreement requires JPMorgan to provide "custodial, settlement and certain other associated services" to LAMPERS.  *See* Custody Agreement § 1.1.  The Custody Agreement obligates JPMorgan to "use reasonable care in performing its obligations under this Agreement."  *Id.* § 5.1.

15.     The Custody Agreement includes FX transactions as part of JPMorgan's responsibilities.  *Id.* § 2.15.  Under the "Foreign Exchange Transactions" provision of the Custody Agreement, JPMorgan agreed that in order to "facilitate the administration of [LAMPERS'] trading and investment activity, [JPMorgan] may … enter into spot or forward foreign exchange contracts with [LAMPERS]."  The provision also states that "Instructions,

including standing Instructions, may be issued with respect to such contracts, but [JPMorgan] may establish rules or limitations concerning any foreign exchange facility made available." *Id.*

**B.     JPMorgan is a Fiduciary of LAMPERS**

16.    As LAMPERS' custodian, JPMorgan has a fiduciary obligation to safeguard LAMPERS' assets.  Whenever JPMorgan deals with LAMPERS' custodial assets it is obligated to act, among other ways, in utmost good faith and with prudence and diligence.  Moreover, in performing indirect FX trades, JPMorgan occupies a superior position over its custodial clients, such as LAMPERS, due to its control over all aspects of the FX transactions and its superior access to confidential information.  This includes JPMorgan's knowledge about the prevailing market FX rates at the time of the transactions, including when trades are executed and the rates it charges clients.  The dynamics of this relationship necessitates that the clients place their trust and confidence in JPMorgan to properly fulfill its duties and execute the FX transactions at the prevailing market rate at the time of the trade.  JPMorgan exploited its fiduciary status when trading FX.

17.    As detailed below, JPMorgan extracted inappropriate fees from its custodial clients, abusing its superior position and disregarding its fiduciary duties.  Moreover, rather than disclose the profits it earned by trading FX, JPMorgan bundled the exchange rate and its profits into the conversion "rate" provided to clients.  Thus, LAMPERS and the Class did not and could not know that JPMorgan was extracting profits from indirect FX trading nor could they determine the amount of profit JPMorgan was extracting from the Class.

18.    JPMorgan's excess profit from FX transactions resulted from a breach of its fiduciary duties, including the duties of care and loyalty, to LAMPERS and the Class. JPMorgan's extraction of illicit profits based on the scheme set forth herein also violated Section 4 of the Custody Agreement, which sets forth the terms of the Bank's compensation.

## V.   DEFENDANTS SECRETLY MANIPULATE FX TRADES IN ORDER TO UNLAWFULLY PROFIT AT THE EXPENSE OF THEIR FIDUCIARY CLIENTS

### A.   JPMorgan Touts the Benefits of Its Standing Instructions Program

19.     JPMorgan executes FX transactions on behalf of its clients through three separate programs: "AutoFX," "Agent FX" and Passive Currency Overlay ("PCO"). The claims asserted herein arise from FX transactions made through AutoFX, which consists of indirect FX transactions, also known as "standing instruction" or "non-negotiated" trades.

20.     In the AutoFX program, transactions are executed and processed automatically using "standing instructions." This type of indirect method requires the custodian, rather than the client, to oversee the trade process from start to completion, thereby requiring the client to trust JPMorgan to properly execute the FX trade in a manner consistent with its fiduciary and contractual obligations.

21.     JPMorgan's standing instruction FX trading service purportedly was "designed to allow clients to outsource their FX requirements to JPMorgan with all the associated benefits of workload, risk and cost reduction." *See* JPMorgan's *Foreign Exchange Services*, attached as Exhibit 1.

22.     JPMorgan's custodial clients also, according to the Bank, benefitted from JPMorgan's "[s]ize, scale and expertise [that] translate into fast, competitive and consistent pricing." *See* JPMorgan's *Trade Execution Services*, attached as Exhibit 2. JPMorgan's website touts its experience, expertise, and the performance of its FX Desk, representing that it is the "FX trading volume leader" and that it "offer[s] a unique combination of comprehensive product expertise, time-zone support, superior liquidity, award-winning research and value-added strategies." *Id.*

**B.**      **JPMorgan Secretly Manipulates FX Trades**

23.      Notwithstanding its fiduciary duties, its contractual obligation to use reasonable care when making indirect FX trades, and the purported cost benefits associated with participating in the indirect FX program, JPMorgan secretly manipulated its clients' indirect FX transactions in a manner designed to extract improper undisclosed profits at its clients' expense.

24.      When clients were "buying" a foreign currency, JPMorgan would obtain the currency at one rate but charge the clients a higher rate. For "sales" of FX currencies, JPMorgan would apply a lower conversion rate, returning less currency to its clients than it obtained (or could have obtained) in connection with the transaction.

25.      In either scenario, JPMorgan pocketed the difference between the price it paid for the currency, or the market rate at the time the FX trade was executed, and the amount debited or credited to clients' accounts. The FX rate JPMorgan charged to its custodial clients was therefore comprised of the FX rate at the time of execution plus an undisclosed fee that was secretly set to maximize JPMorgan's profits.

26.      Similar schemes have been recently disclosed through a series of *qui tam* lawsuits alleging that JPMorgan's peer custodial banks, namely, State Street Corp. ("State Street") and Bank of New York Mellon ("BNY Mellon"), were actively manipulating FX rates charged to custodial clients placing indirect FX trades. These whistleblower complaints allege that custodial banks observe post-trade movements in the FX market and charge their clients FX prices that are different than the actual FX trade rate paid by the banks or the applicable rate at the time a trade is executed. The spread between the actual rate and the rate charged to clients, as is alleged here, is subsequently pocketed by the banks as profit and never disclosed to clients.

27.     LAMPERS, like the custodial clients of State Street and BNY Mellon, was a victim of secret misconduct and did not authorize its custodian and agent, JPMorgan, to manipulate FX trades in the manner set forth herein.

28.     LAMPERS' holdings include international assets that require FX transactions in connection with the purchase and sale of securities and for the repatriation of foreign currencies into USD.   The nature and structure of JPMorgan's indirect FX trading program, AutoFX, required LAMPERS and the Class to place a high degree of trust in JPMorgan and fully depend on JPMorgan to execute FX transactions without reaping secret profits at their expense. JPMorgan designed AutoFX so that LAMPERS and the Class had no choice but to rely upon JPMorgan to execute FX transactions under conditions in which JPMorgan controlled all aspects of FX trades, including the rate and time of the trade.   Given the imbalance of knowledge and control inherent in AutoFX, participants must rely on JPMorgan to execute FX trades honestly, to accurately report the applicable FX rate, and to carry out the trades in a manner consistent with its fiduciary and contractual obligations.

29.     The disadvantageous rates charged to LAMPERS are set forth in the following analysis, which plots a random sample of LAMPERS' FX trades executed by JPMorgan on an indirect basis during the Class Period (Graph 1):



The percentages on the x-axis of Graph 1 coincide with the best and worst daily FX rates for any given trading day. Trades at 100% were executed at the most favorable FX rate within a trading day, whereas trades at -100% were executed at the worst possible FX rate within a trading day. Trades below -100% were priced at less than the worst possible FX rate. In a normal distribution, the largest spike should be near 0% (the daily FX mid-point), with a roughly equal distribution between favorable and unfavorable rates.

30.     As illustrated in Graph 1, the sample data analyzed for LAMPERS shows a clear spike in trades in the -100% to -75% grade. Based on the spike, *36% of the sample trades were priced at or near the absolute worst FX rate* for the sample period and *more than 79% of LAMPERS' sample trades were priced below the 0% grade* – rates that were unfavorable to LAMPERS. Moreover, the analysis identified a number of trades that were priced *below the worst possible rate* for a given trading day. The analysis establishes that JPMorgan routinely charged LAMPERS unfavorable rates and often the worst possible rate for a given trading day. The spread between the market rate when a trade was executed and the "rate" charged to

10

LAMPERS was retained by JPMorgan as undisclosed profits.  JPMorgan's retention of these illicit undisclosed profits violated its fiduciary and contractual obligations to LAMPERS and the Class.

## VI.    JPMORGAN'S CLIENTS COULD NOT DISCOVER ITS MISCONDUCT

31.     JPMorgan is in sole possession of records accurately detailing the manipulated FX transactions and the rates it actually incurred when executing FX transactions for its clients.

32.     LAMPERS could not discover JPMorgan's FX manipulation because the account statements provided by JPMorgan failed to provide time-stamped execution prices.  Instead, those statements merely reported FX conversion rates that fell within (or close to) the high and low range for each day's FX rates.  This precluded clients from discovering that the FX rates they were being charged were manipulated by JPMorgan.

33.     Specifically, LAMPERS was not aware, and JPMorgan did not disclose, that:

- the costs of the reported indirect FX transactions JPMorgan executed were not the actual FX costs it incurred and were not consistent with the actual market FX rates at the time LAMPERS' trades were executed;

- JPMorgan would and did retain the difference between the actual FX rates it incurred to execute a trade and the manipulated FX rates it charged LAMPERS; or

- JPMorgan would take hidden fees or profits from the FX transactions it executed, including mark-ups or mark-downs, when executing FX trades on LAMPERS' behalf.

34.     JPMorgan's practices affected all Class members.  On information and belief, no Class member was aware of the facts set forth in the preceding paragraph, nor could any Class member have discovered those facts.

35.     LAMPERS and the Class have been damaged as a direct and proximate result of JPMorgan's practices.

## VII.   CLASS ACTION ALLEGATIONS

36.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  This action is brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief and Rule 23(b)(3) for monetary damages.

37.     This suit is a class action brought on behalf of a Class of all public and private pension funds and any other trusts or funds for which JPMorgan served as the custodial bank and executed FX transactions on an "indirect" basis (or based on "standing instructions") during the Class Period.

38.     The action also asserts claims, pursuant to Fed. R. Civ. P. 23(c)(5), on behalf of a sub-Class of employee benefit plans covered by ERISA for which JPMorgan served as the custodial bank and executed FX transactions on an "indirect" basis (or based on "standing instructions") during the Class Period (the "ERISA Sub-Class").

39.     The Defendants, any entity in which any Defendant has a controlling interest, and the officers, directors, legal representatives, heirs, successors, subsidiaries and/or assigns of any such individual or entity are excluded from the Class.

40.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.  Plaintiff believes that there are hundreds, if not thousands, of proposed Class members.

41.     There are numerous questions of law and fact common to LAMPERS and the Class, including:

      (a) whether JPMorgan owed fiduciary duties to its custodial clients;

      (b) whether JPMorgan's indirect FX program was structured in a way such that clients were forced to place their trust in JPMorgan when trading FX;

(c) whether JPMorgan violated the statutory, fiduciary, contractual or other obligations it owed to its clients by charging FX rates that did not reflect actual market rates at the time the indirect FX trades were executed;

(d) whether JPMorgan breached the statutory, fiduciary, contractual or other obligations it owed to its custodial clients by retaining the margin between the actual (or market) FX rate when executing an indirect FX transaction and the rate it actually charged the client;

(e) whether Defendants were unjustly enriched by the conduct set forth herein;

(f) whether LAMPERS and other custodial clients suffered monetary damages as a result of the Defendants' actions and, if so, the proper measure of those damages;

(g) whether the Class is entitled to appropriate injunctive or equitable relief.

42.     LAMPERS' claims are typical of the claims of the members of the Class and it is a member of the Class described herein.

43.     LAMPERS is willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.  LAMPERS will fairly and adequately protect the interests of the Class and has no interests adverse to, or which conflict with, the interests of other members of the Class.

44.     LAMPERS' interests are co-extensive with and not antagonistic to those of the absent Class members.  LAMPERS will undertake to represent and protect the interests of absent Class members.

13

45.     LAMPERS has engaged the services of the undersigned counsel, who are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, LAMPERS and absent Class members.

46.     The questions of law and fact common to the Class, as summarized above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23.

47.     A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

48.     LAMPERS knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

49.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## VIII.    CLAIMS FOR RELIEF

**COUNT I**
**BREACH OF CONTRACT**
**(Against JPMorgan)**

50.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.  The Count excludes the ERISA Sub-Class.

51.     Under the terms of the Custody Agreement, JPMorgan is obligated to "use reasonable care in performing its obligations," which includes pricing FX trades and adequately describing the standing instructions program to LAMPERS and its clients. Custody Agreement § 5.1.

52.     The Foreign Exchange Transactions section of the Custody Agreement sets forth the procedure that JPMorgan will use when executing FX trades for its custodial clients and states that JPMorgan will execute FX trades in a manner consistent with the terms of the Custody Agreement. *See id.* § 2.15.

53.     On information and belief, the provisions of the Custody Agreement at issue herein exist in substantially similar form in all custodial contracts between JPMorgan and the members of the Class.

54.     JPMorgan breached the Custody Agreement (and contracts with other Class members) by charging LAMPERS and the Class rates for the execution of FX trades that were not reasonable but, instead, were designed to extract substantial and secret profits for JPMorgan at the Class's expense.

55.     JPMorgan further breached the Custody Agreement by charging LAMPERS and the Class FX rates that included undisclosed and non-agreed upon fees in direct contradiction to and violation of Section 4. *See id.* § 4.1.

56.     JPMorgan was at all times obligated to execute FX trades in a manner consistent with the terms of the Custody Agreement and with the implied covenant of good faith and fair dealing imposed by law.

57.     JPMorgan breached its obligation to act in good faith and fairly by secretly charging LAMPERS and the Class indirect FX rates that were not market rates and were neither

15

reasonable nor appropriate but, instead, were specifically created to extract profits at the expense of LAMPERS and the Class. Based on the nature of the indirect FX program, JPMorgan unilaterally set its own compensation (the difference between the fictitious rate JPMorgan charged LAMPERS and the Class and the actual market rate) in a manner that prevented any client from learning the significant risk-free profits JPMorgan made on FX trading. JPMorgan also failed to act in good faith or deal fairly with LAMPERS and the Class by using its superior knowledge of its FX trading practices to disadvantage LAMPERS and the Class by (a) failing to specify how FX rates would be set and (b) failing to disclose that the FX rates it charged LAMPERS and the Class would not be (and in fact were not) based on prevailing FX rates at the time the trades were executed.

58.     JPMorgan's breach of the implied covenant of good faith and fair dealing represents a breach of the Custody Agreement.

59.     LAMPERS has substantially performed all of the obligations imposed on it by the Custody Agreement.

60.     LAMPERS and the Class have been damaged as a direct and proximate result of JPMorgan's breach and are entitled to damages.

## COUNT II
### BREACH OF FIDUCIARY DUTY
**(Against JPMorgan, Pleaded in the Alternative)**

61.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein. The Count excludes the ERISA Sub-Class.

62.     JPMorgan has or had substantial discretion and control over LAMPERS' assets and those of the Class. Through the custodial relationship between JPMorgan and the Class, which imbued JPMorgan with power over the assets of the Class, JPMorgan was empowered to

act as agent of the members of the Class with regard to the execution of FX trades. JPMorgan also had substantial discretion and absolute control over the indirect FX transactions it transacted on behalf of LAMPERS and the Class.

63.     JPMorgan's status as a custodian and an agent for the Class, as well as the nature of JPMorgan's indirect FX trading program, made LAMPERS and the Class fully dependent upon JPMorgan to execute FX trades, over which JPMorgan had control, in an honest manner without taking secret profits. This dependence on JPMorgan for information, coupled with JPMorgan's absolute control over the timing and conversion rate for each indirect FX transaction, gave rise to a fiduciary duty and duty of care on the part of JPMorgan:

(a) JPMorgan occupied a superior position over LAMPERS and the Class with respect to the execution of FX transactions, and had superior access to confidential information about prevailing market FX rates at the time indirect FX transactions were actually executed.

(b) JPMorgan's superior position and status as a fiduciary required LAMPERS and the Class to repose their trust and confidence in JPMorgan, who acted as their custodian and fiduciary, to fulfill their duties and to properly execute FX transactions at the prevailing market rate at the time of the transaction. By virtue of electing to have JPMorgan execute FX trades on their behalf through the indirect FX trading program, LAMPERS and the Class reasonably placed their trust and confidence in JPMorgan.

64.     As a fiduciary, JPMorgan was required, among other things, to discharge its obligations with respect to LAMPERS and the Class (a) solely in the interest of LAMPERS and the Class, (b) for the exclusive purpose of providing benefits to LAMPERS and the Class, and

(c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

65.     JPMorgan breached its fiduciary duties to LAMPERS and the Class by charging clients FX rates that were inconsistent with the rates paid by JPMorgan, or with the actual rates prevailing at the time the FX trade was executed, and then keeping the difference between the actual FX rates incurred by JPMorgan (or market rate at the time a trade was executed) and the fictitious FX rates JPMorgan charged LAMPERS and the Class.

66.     LAMPERS and the Class have been damaged as a direct and proximate result of these breaches of fiduciary duties and are entitled to damages, and appropriate equitable relief, including accounting and imposition of a constructive trust.

### COUNT III
### UNJUST ENRICHMENT
### (Against All Defendants, Pleaded in the Alternative as to JPMorgan)

67.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.  The Count excludes the ERISA Sub-Class.

68.     Defendants benefitted from the unlawful acts, omissions and breaches of fiduciary duties to LAMPERS and the Class.  These unlawful acts, omissions and fiduciary breaches caused LAMPERS and the Class to suffer injury and monetary loss.

69.     It is unjust and inequitable for Defendants to enrich themselves through the manipulation of FX transactions as described herein.

70.     Equity and good conscience require that Defendants disgorge all such unjust gains and that Defendants pay the amounts by which they were unjustly enriched to LAMPERS and the Class in an amount to be determined at trial.

71.     LAMPERS and the Class seek restitution from Defendants, and seek an order of Court requiring them to disgorge all profits, benefits, and other such compensation obtained by Defendants through their wrongful conduct and fiduciary breaches.

72.     LAMPERS and the Class are entitled to a constructive trust impressed on the benefits Defendants unlawfully derived from their unjust enrichment and inequitable conduct.

**COUNT IV**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 *et seq.***
**(Against JPMorgan)**

73.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.  The Count excludes the ERISA Sub-Class.

74.     LAMPERS and members of the Class are consumers who made FX transactions through JPMorgan.  LAMPERS brings this count pursuant to New York General Business Law § 349 *et seq.*

75.     JPMorgan engaged in deceptive practices in the execution of FX trades, including: (1) manipulating the indirect FX rates it charged its clients in order to reap illicit profits at its clients' expense; (2) consistently executing FX trades at highly unfavorable (and at some of the worst) rates over trading days; and (3) failing to disclose and actively concealing that its indirect FX "rates" included unreported compensation and that JPMorgan's compensation was entirely in its control.

76.     JPMorgan's actions constitute unfair, unconscionable and/or deceptive trade practices in the course of their business and in the conduct of trade or commerce, in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. § 349 *et seq.*

77.     Such actions and failures to act have caused direct, foreseeable, and proximate damages to LAMPERS and the Class.

19

78.     JPMorgan's conduct has caused, and continues to cause, harm to the public.  The harm to the public includes overcharging, or under-crediting, custody clients on their indirect FX transactions throughout the Class Period.  The amount of the unlawful profits obtained by JPMorgan as a result of their practices, during the Class Period, is likely in the hundreds of millions of dollars.  JPMorgan unlawfully took these monies directly from the coffers of LAMPERS and the Class.  While JPMorgan was perpetuating its scheme, members of the Class struggled – particularly in the last few years – to meet their funding obligations in the midst of a turbulent economic environment.

79.     JPMorgan's conduct as alleged herein has damaged and will continue to damage LAMPERS and the Class in an amount that is unknown at present but will be proved at trial.

## COUNT V
## ACCOUNTING
### (Against JPMorgan, Pleaded in the Alternative)

80.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.  The Count excludes the ERISA Sub-Class.

81.     JPMorgan's status as a custodian of LAMPERS' and the Class's assets and/or the superior position and access to confidential information JPMorgan had when executing indirect FX trades for LAMPERS and the Class created a fiduciary relationship between JPMorgan and the Class.

82.     LAMPERS and the Class entrusted their assets to JPMorgan by allowing JPMorgan to act as a fiduciary and to execute FX transactions through the Bank's indirect FX program.

83.     JPMorgan exploited its position of trust by secretly extracting funds properly belonging to LAMPERS and the Class by charging them fictitious FX rates in the manner set forth herein.

84.     Given the nature of the scheme and the undisclosed compensation JPMorgan unilaterally extracted from the Class's assets without the Class's knowledge or authorization, Plaintiffs do not know and are unable to ascertain with certainty what money has been extracted by JPMorgan as illicit profits and what portion was properly used to convert the Class's FX trades.

85.     To the extent it is determined that Plaintiffs have no adequate remedy at law, they are entitled to an accounting.

## COUNT VI
## BREACH OF ERISA FIDUCIARY DUTIES
### (Against JPMorgan On Behalf of the ERISA Sub-Class Only)

86.     LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

87.     At all relevant times, JPMorgan was a fiduciary of the ERISA Sub-Class within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  JPMorgan exercised discretionary authority or control with respect to the execution of FX transactions on behalf of the ERISA Sub-Class.

88.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that assets within the plan are prudently managed.  As detailed herein, JPMorgan exercised discretionary authority or control over the ERISA Sub-Class's plan assets in the course of executing FX transactions.

89.    As a fiduciary, JPMorgan was required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to discharge its obligations with respect to the ERISA Sub-Class (a) solely in the interest of the members in the ERISA Sub-Class, (b) for the exclusive purpose of providing benefits to members in the ERISA Sub-Class, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with all applicable documents and instruments.

90.    Additionally, ERISA § 406(a), 29 U.S.C. § 1106(a), prohibits a plan fiduciary from directly or indirectly causing the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).  Pursuant to ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), a party in interest may receive payment from a plan for services rendered to the plan, so long as the party in interest receives no more than reasonable compensation.

91.    JPMorgan breached its fiduciary duties to members in the ERISA Sub-Class by failing to properly execute FX transactions, charging false FX rates, and pocketing the difference between actual FX rates incurred by the JPMorgan and false FX rates charged to members in the ERISA Sub-Class.  The conduct also allowed JPMorgan to receive excessive undisclosed compensation from the ERISA Sub-Class's plan assets.

92.    ERISA § 409(a), 29 U.S.C. § 1109(a), provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall

be subject to other equitable or remedial relied as the court may deem appropriate, including removal of such fiduciary.

93.    Because ERISA explicitly authorizes plan fiduciaries to sue for relief to a plan from beaches of fiduciary duty such as those alleged herein, this action is brought on behalf of the ERISA Sub-Class, to remedy JPMorgan's breaches of fiduciary duties under § 404(a).

94.    Accordingly, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), JPMorgan is obligated to restore losses suffered by the ERISA Sub-Class.

**COUNT VII**
**CLAIM FOR DISGORGEMENT OF PROFITS**
**(Against All Defendants On Behalf of the ERISA Sub-Class Only)**

95.    LAMPERS restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

96.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan fiduciary to bring an action to redress violations and/or enforce provisions of Title I of ERISA.

97.    Each Defendant possessed actual or constructive knowledge of the circumstances that rendered the transactions detailed herein unlawful, is jointly and severally liable under ERISA § 502(a)(3).

98.    The Defendants are obligated to restore to the ERISA Sub-Class all profits revived by the Defendants from the conduct set forth herein.

**IX.    PRAYER FOR RELIEF**

WHEREFORE, LAMPERS requests the following:

(a) Certification of this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and a finding that LAMPERS is a proper Class representative;

(b) Such preliminary and permanent equitable relief, including imposition of a constructive trust and an accounting, as is appropriate to preserve the assets Defendants wrongfully took from LAMPERS and the Class and an accounting from JPMorgan;

(c) Compensatory, consequential, and general damages in an amount to be determined at trial;

(d) Disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

(e) Punitive damages for each claim to the maximum extent available under the law on account of the outrageous nature of Defendants' willful and wanton disregard for the rights of LAMPERS and the Class;

(f) Costs and disbursements of the action;

(g) Pre-judgment and post-judgment interest;

(h) Reasonable attorneys' fees; and

(i) Such other and further relief as this Court may deem just and proper.

## X.   <u>JURY TRIAL DEMANDED</u>

LAMPERS hereby demands a jury trial.

Dated:  August 30, 2012

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

**KESSLER TOPAZ MELTZER
& CHECK, LLP**
Joseph H. Meltzer
Peter H. LeVan, Jr.
Naumon A. Amjed
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
jmeltzer@ktmc.com
plevan@ktmc.com
namjed@ktmc.com

**NIX PATTERSON & ROACH, LLP**
Bradley E. Beckworth
205 Linda Drive
Daingerfield, TX  75638
Tel:  (903) 645-7333
Fax:  (903) 645-4415
bbeckworth@nixlawfirm.com
    and
Jeffrey J. Angelovich
Brad E. Seidel
3600 N. Capital of Texas Hwy., Bldg. B
Suite 350
Austin, TX  78746
Tel: (512) 328-5333
Fax: (512) 328-5335
jangelovich@npraustin.com
bradseidel@nixlawfirm.com

*Counsel for Plaintiff Louisiana Municipal Police
Employees' Retirement System and Proposed Co-Lead
Counsel for the Class*

25

# EXHIBIT 1

# WORLDWIDE SECURITIES SERVICES

# Foreign Exchange Services
## Market-leading and comprehensive support to manage currency risk

As a leading global foreign exchange (FX) market maker, liquidity provider and custodian, J.P. Morgan helps institutions manage currency risk and maximise yield with fast, competitive and consistent FX services, customised to clients' unique business imperatives and risk profile. J.P. Morgan is focused on finding the best possible solution for each client using our unique combination of geographic breadth, product depth, superior liquidity, credit quality, research and value-added strategies. Over the last 20 years, we have invested in building linkages between our custody platforms and our foreign exchange execution centres. This allows for a flexible, seamless, secure and efficient range of execution options from which clients may choose. Our approach to client service means we deliver the full capabilities of the firm — including risk, credit and market intelligence, world-class technology and global trading capabilities — to help all clients of various sizes enhance return, mitigate risk and increase efficiency.

## Highlights

- FX trading volume leader — executes 7-10% of world's FX volume across 90 countries

- Comprehensive product range: spot, forwards (both swap and outright), currency options, non deliverable forwards, and a broad range of currencies that are not freely convertible

- Access to all major third-party electronic FX portals, including FXall, FX Connect and Currenex

- Top rated by clients and industry surveys:

  - 2009 Best FX Provider, Top 100 Asset Managers by third-party AUM — *Global Investor*, FX Survey

  - 2009 Best FX Provider, Overall: European Respondents — *Global Investor*, FX Survey

  - 2009 Best Research: Emerging Markets and Macroeconomic — *Global Investor*, FX Survey

  - 2009 Best Advice: Options — *Global Investor*, FX Survey

*(Continued)*

### KEY FEATURES AND BENEFITS

| Client Need | J.P. Morgan Solutions |
|---|---|
| Increase Efficiency | • **Streamline FX activities while substantially reducing transaction times** and the potential for errors through online execution and confirmation products and access to all major third-party electronic FX portals, including FXall, FX Connect and Currenex. |
| Mitigate Risk | • **Eliminate counterparty concerns.** As a J.P. Morgan FX client, JPMorgan Chase Bank, N.A. would be your contractual counterparty. As such, clients have the benefit of dealing with an entity recognised for its fortress balance sheet and preeminent credit position. |
| | • **Prematch securities** to reduce transaction risk in highly regulated / restricted markets through Agent FX |
| | • **Neutralise currency exposure to multicurrency assets** with Passive Currency Overlay tailored to unique investment objectives |
| | • **Implement standing instructions** for automated FX execution across securities transactions, dividend and income receipts, corporate actions and tax reclaim activity |
| | • **Ensure efficient execution and centralised clearing** across world markets and exchanges with 22-hour global coverage on all market days through J.P. Morgan's London FX desk which is dedicated exclusively to custody clients. |
| | • **Access proprietary analytical risk management tools and award-winning foreign exchange research**, including daily/weekly/monthly economic updates, technical analysis and FX options and volatility research. |
| Enhance Returns | • **Receive tight market reflective prices from the premier FX market maker.** Size, scale and expertise translate into fast, competitive and consistent pricing. |
| | • **Improve trading and investment decisions with customised guidance** from knowledgeable trading and research team. Advice tailored to unique business goals, trading/hedging style, investment preferences and risk appetite. |

**To learn more, speak to your representative or visit us at jpmorgan.com/wss**

©2010 JPMorgan Chase Bank, N.A. All rights reserved.
This brochure contains a summary of the subject matter (and is subject to change without notice) and is provided solely for general information purposes. J.P. Morgan does not make any representation or warranty, whether expressed or implied, in relation to the completeness, accuracy, currency or reliability of the information contained in this brochure nor as to the legal, regulatory, financial or tax implications of the matters referred herein. This brochure does not constitute a solicitation in any jurisdiction in which such a solicitation is unlawful or to any person to whom it is unlawful. Issued and approved for distribution in the United Kingdom and the European Economic Area by J.P. Morgan Europe Limited. In the United Kingdom, JPMorgan Chase Bank, N.A., London branch and J.P. Morgan Europe Limited are authorised and regulated by the Financial Services Authority.

Comprehensive FX solutions to save time, reduce cost and manage risk

# AutoFX
## Enables clients to reduce workload, risk and costs through standing instructions

Auto FX is J.P. Morgan Worldwide Securities Services' purpose-built FX system for the automated execution and processing of FX deals using standing instructions. The system allows clients to outsource their FX requirements to J.P. Morgan with all the associated benefits of workload, risk and cost reduction. Standing instructions can be established for asset trades, associated income receipts, corporate actions and tax reclaim activity. The system is extremely flexible, and clients can establish standing instructions by transaction type, individual currency or account. Furthermore, the client can override particular standing instructions for specific transactions. Apart from executing FX trades, it also delivers high-quality automated trade matching and same-day issuance of confirmations.

# Agent FX
## Prematching of securities to reduce transaction risks in highly regulated/restricted markets

J.P. Morgan has established Agent FX as a best practice in consideration of the risks associated with transactions in highly regulated/restricted markets. The system is extremely flexible and can accommodate the often specific and diverse regulations that have been decreed by individual regulators. J.P. Morgan manages the FX transaction in conjunction with the underlying securities transaction, and as a result, FX transactions are not executed until the subcustodian advises J.P. Morgan that the prematching of the associated security transaction has been completed.

# Passive Currency Overlay (PCO)
## Manage currency exposure from multicurrency assets

J.P. Morgan's PCO programme allows clients to broadly neutralise, in whole or in part, currency exposure arising from holding international assets denominated in currencies other than their base currency or against the relevant index benchmark. The programme is very flexible and can be structured to include various asset classes, including infrastructure, private equity and property, as well as traditional assets such as equities and bonds. Furthermore, exposure to restricted emerging market currencies can be incorporated. J.P. Morgan also offers *Share Class Hedging*, which can be utilised by clients to attract additional capital from investors whose currency differs to the denomination currency of a fund. J.P. Morgan offers bespoke solutions with complete flexibility whereby the PCO programme can be customised to meet specific client investment objectives.



©2010 JPMorgan Chase Bank, N.A. All rights reserved.
This brochure contains a summary of the subject matter (and is subject to change without notice) and is provided solely for general information purposes. J.P. Morgan does not make any representation or warranty, whether expressed or implied, in relation to the completeness, accuracy, currency or reliability of the information contained in this brochure nor as to the legal, regulatory, financial or tax implications of the matters referred herein. This brochure does not constitute a solicitation in any jurisdiction in which such a solicitation is unlawful or to any person to whom it is unlawful. Issued and approved for distribution in the United Kingdom and the European Economic Area by J.P. Morgan Europe Limited. In the United Kingdom, JPMorgan Chase Bank, N.A., London branch and J.P. Morgan Europe Limited are authorised and regulated by the Financial Services Authority.

# EXHIBIT 2

J.P. Morgan | J.P. Morgan Products >> Trade Execution Services



J.P. Morgan help clients manage currency and market risk through our combined capabilities as a leading trading house, premiere investment bank and global custodian. Our size, scale and expertise translates into fast, competitive and consistent pricing for all execution services.

### Foreign Exchange

J.P. Morgan is a FX trading volume leader, offering clients tight, market reflective prices and executing 7-10% of world's FX volume. Our foreign exchange services help clients manage regulatory risk and currency exposure and are customized to clients' unique business imperatives and risk profile. We offer a unique combination of comprehensive product expertise, time-zone support, superior liquidity, award-winning research and value-added strategies.

### Futures & Options

J.P. Morgan, through its Futures & Options Group, offers institutional investors the ability to link exchange-traded derivatives execution, clearing and reporting with its custody service. Clients can profit from access to our comprehensive product base and can leverage the knowledge and capabilities derived from J.P. Morgan's size, strength and market position.

### Commission Recapture

Offered in partnership with Capital Institutional Services (CAPIS), J.P. Morgan's commission recapture program helps institutional investors reduce their trading costs. By directing their investment managers or subadvisors to execute a portion of their trades through firms on CAPIS' extensive list of well-known brokers, clients qualify for a rebate on commission expenses.

### Transition Management

J.P. Morgan is committed to helping institutional investors restructure their assets and achieve their desired portfolio exposure in a timely, risk controlled and cost effective manner. Our clients receive experienced transition management expertise for strategy development, planning, optimised trading, execution, operations and post trade analysis. The value we provide clients includes our combined analytics and execution capabilities as a premiere investment bank and our operational and administrative expertise as a leading global custodian.

UP

J.P. Morgan / JPMorgan Chase / Chase          Terms of Use / Privacy and Security / Site Map   Copyright © 2012 JPMorgan Chase & Co. All rights reserved.