UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
LOUISIANA MUNICIPAL POLICE EMPLOYEES'     :
RETIREMENT SYSTEM, individually and on    :       12 Civ. 6659 (DLC)
behalf of all others similarly situated,  :
                                          :          OPINION & ORDER
                      Plaintiff,          :
                                          :
              -v-                         :
                                          :
JPMORGAN CHASE & CO. and JPMORGAN CHASE   :
BANK, N.A.,                               :
                                          :
                      Defendants.         :
                                          :
------------------------------------------ X
Plaintiff:

John C. Browne
Stefanie J. Sundel
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019

Joseph H. Meltzer
Sharan Nirmul
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087

Defendants:

Susan L. Saltzstein
Marco E. Schnabl
Jeffrey S. Geier
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036


DENISE COTE, District Judge:

     Plaintiff Louisiana Municipal Police Employees' Retirement

System ("LAMPERS") brings suit individually and on behalf of all

others similarly situated against JPMorgan Chase & Co. ("JPM") and JPMorgan Chase Bank, N.A. (the "Bank") (collectively "JPMorgan" or "defendants"), for charging undisclosed mark-ups on foreign exchange transactions that JPMorgan executed for custodial clients.  This Opinion grants the defendants' motion to dismiss.

BACKGROUND

The following facts are taken from the Consolidated Amended Class Action Complaint ("Amended Complaint") and documents integral to it.[1]  JPM owns and operates the third-largest custodian bank in the world.  The Bank is a subsidiary of JPM and provides custodial banking services to institutional investors.  LAMPERS -- one such institutional investor -- is a pension fund and retirement system that provides retirement benefits to full-time municipal police officers and employees in the State of Louisiana.  Since 2005, LAMPERS has been a custodial client of the Bank.  It uses the Bank's custodial services for multicurrency trading and settlements, accounting, portfolio servicing and reporting, and income collection.

---

[1] The integral documents include the Global Custody Agreement executed by LAMPERS and the Bank, the accompanying Fee Schedule, a "Suppress AutoFX Form" which was executed by the plaintiff, certain regulatory disclosures sent by the Bank to LAMPERS and other custodial clients, and a page of defendants' website.

Custodial clients of the Bank, including LAMPERS, often invest in multiple securities of foreign issuers and occasionally engage in direct currency trading as well.  As a result of these activities, custodial clients regularly need to convert U.S. Dollars into foreign currencies, or foreign currencies into U.S. Dollars.  This conversion is accomplished through a Foreign Exchange or "FX" transaction.  In an FX transaction one currency is bought or sold in exchange for another currency at a particular rate that is available in the currency market.  The Bank offers FX services to its custodial clients and regularly executes FX transactions at its customers' direction.  At its core, the present action is based on the allegation that the Bank executed certain FX transactions at one rate, but charged the custodial clients a different rate, resulting in profit for the Bank, and that the Bank failed to disclose this practice to its custodial clients.

The agreement between LAMPERS and the Bank regarding the Bank's provision of custodial services is embodied in a Global Custody Agreement ("Custody Agreement"), which the parties executed on July 28, 2005.  The Custody Agreement "sets out the terms governing custodial, settlement and certain other associated services offered by [the] Bank to Customer" and provides that the "[B]ank will be responsible for the performance of only those Securities custody duties that are set

forth in this Agreement."  In the Custody Agreement, LAMPERS acknowledged that the "Bank is not providing any legal, tax or investment advice in connection with the services hereunder."

Section 1.2 of the Custody Agreement defines certain terms used in the agreement.  The words "custodial" and "services" are not defined.

Section 2 of the Custody Agreement is entitled "What Bank is Required to Do."  This section, which includes fifteen subsections, delineates a number of the Bank's obligations under the Custody Agreement.  For instance, section 2.1 states that the Bank "will establish and maintain" both a Securities Account -- to hold the customer's financial assets -- and a Cash Account -- to hold the customer's cash.  Section 2 also requires the Bank to segregate the client's assets, to use reasonable care in settling trades, to make certain book entries, to notify the client of certain events, to forward certain proxy material, to allow auditing, and to hold assets generally in the country in which their principal trading market is located.  The Bank is also required to perform certain ministerial acts, like presenting for redemption any financial asset for which the Bank has received notice of a call, or executing certificates required to obtain payments on financial assets.

4

The last subsection is subsection 2.15, which is entitled "Foreign Exchange Transactions," and is at the heart of this dispute.  This subsection provides that:

> To facilitate the administration of Customer's trading and investment activity, Bank may, but will not be obliged to, enter into spot or forward foreign exchange contracts with Customer, or an Authorized Person, and may also provide foreign exchange contracts and facilities through its Affiliates or Subcustodians.  Instructions, including standing Instructions, may be issued with respect to such contracts, but Bank may establish rules or limitations concerning any foreign exchange facility made available.  In all cases where Bank, its Affiliates or Subcustodians enter into a master foreign exchange contract that covers foreign exchange transactions for the Accounts, the terms and conditions of that foreign exchange contract and, to the extent not inconsistent, this Agreement, will apply to such transactions.

(Emphasis supplied.)  The parties at no point entered into a master foreign exchange contract.

The Custody Agreement further states that the "Customer authorizes Bank to accept and act upon any Instructions received by it without inquiry."  Section 7.4 of the Custody Agreement warns that the Bank may have a "potential conflict of duty or interest" with respect to a client's transactions, and provides examples.  The client therefore "acknowledges" that the Bank "may be in possession of information tending to show that the Instructions received may not be in the best interests of Customer but that Bank is not under any duty to disclose any such information."

The Custody Agreement also describes the "fees, expenses and other amounts" that LAMPERS owes to the Bank for the services that the Bank provides.[2]  In particular, section 4.1, states that

> Customer will pay Bank <u>for its services hereunder</u> the <u>fees</u> set forth in Schedule A hereto or such other amounts as may be agreed upon in writing from time to time, together with Bank's reasonable out-of-pocket or incidental expenses, including, but not limited to, legal fees and tax or related fees incidental to processing by governmental authorities, issuers, or their agents.

(Emphasis supplied.)  The accompanying Fee Schedule, which sets forth just four figures, includes a "Custody and Accounting Flat Fee Per Year" of $85,900.00.  Beneath this figure appears "Note: No Transaction Fees."  The Fee Schedule also lists three fees that are assessed "per account per year."  These fees are for "Compliance," "Alternative Asset Services," and "Performance Measurement," and no one of these fees exceeds $4,500.

Finally, pursuant to section 2.11, the Bank is required to send to the customer a formal statement of account, and is protected from claims arising from the disclosures in that statement unless they are made within sixty days.  That section provides that the

---

[2] The caption for this section reads "Fees, Expenses and Other Amounts Owing to Bank", but section 10.3 explains that "[h]eadings are for convenience only and are not intended to affect interpretation."

Bank will not be liable with respect to any matter set
forth in those portions of any Statement of Account or
any such advice (or reasonably implied therefrom) to
which Customer has not given Bank a written exception
or objection within sixty (60) days of receipt of the
Statement of Account, provided such matter is not the
result of Bank's willful misconduct or bad faith.

Custodial clients of the Bank are able to execute FX

transactions with the Bank in two ways.  Clients can enter into

"direct" FX transactions, in which the defendants quote an

exchange rate based on current market rates and the client can

decide whether to accept or reject the proposed rate.  If the

client accepts defendants' proposed rate, the transaction is

executed at the agreed-upon rate.  Alternatively, clients can

elect to automate their FX transactions through "Standing

Instructions" to the Bank.  This automated program is called

"AutoFX" and currency exchanges conducted through this program

are sometimes called "Indirect" FX transactions.

To use the AutoFX program clients must enroll and create

"Standing Instructions."  LAMPERS enrolled in the AutoFX program

sometime in or before January 2007.[3]  When a customer enrolls in

the program and creates Standing Instructions, the customer does

---

[3] It is clear on the face of the Amended Complaint that the
plaintiff enrolled in the program on or before January 2, 2007,
because the Amended Complaint contains a "Currency Audit" of
plaintiff's Indirect FX transactions for the period of January
2, 2007 through December 31, 2008.  The defendants' Motion to
Dismiss suggests that LAMPERS enrolled much earlier.  Because
this fact does not appear in the Amended Complaint, however,
this Opinion does not rely on it.

not individually negotiate the exchange rate for each transaction.  Instead, the Standing Instructions direct the execution of the FX transaction on a recurring basis and JPMorgan simply complies.

In response to its customers' Standing Instructions, JPMorgan buys and sells currencies on the currency market. After the close of trading, JPMorgan's FX traders use a pricing matrix to examine the range of exchange rates that were available throughout the day.  The Amended Complaint alleges that the traders then select a rate to charge the customer that is either higher or lower (depending on whether JPMorgan was buying or selling currency) than the rate JPMorgan received. For example, if a customer's Standing Instruction requested the purchase of Euros, and JPMorgan was able to purchase Euros for 1.40 at the prevailing market rate, the FX trader might then choose to charge the customer for the Euros at a rate of 1.42. As reflected by this example, the two-cent spread was retained by JPMorgan as its "commission" on the trade.  In selecting the rate to charge customers, the defendants regularly chose the worst (or nearly the worst) rate of the day.  On occasion, the defendants charged the customers a rate that fell outside the range of market prices available on the day the trade was executed.

The defendants advertised the benefits of the AutoFX program to their customers.  In particular, they represented that AutoFX was designed to "reduce costs" and offer "competitive rates provided directly by the dealing room." Their website depicted the program as allowing "clients to outsource their FX requirements to JMorgan with all the associated benefits of workload, risk and cost reduction."[4]  The defendants also emphasized their own skill and value in connection with the program, indicating that their "size, scale and expertise . . . translates into fast, competitive and consistent pricing."  The defendants described themselves as "the world's 'FX trading volume leader,'" and thus able to "offer a unique combination of comprehensive product expertise, time-zone support, superior liquidity, award-winning research and value-added strategies."  In letters sent to custodial clients to solicit their enrollment in the AutoFX program -- including a letter received by LAMPERS on June 8, 2009 -- the Bank explained that automation of FX transactions would "benefit

---

[4] A screenshot of the referenced website was attached as an exhibit to the plaintiff's original complaint, but not to its Amended Complaint.  In addition to including the language described above, the website also advertised that the Bank's FX services allow a customer to "[e]liminate counterparty concerns," stating that "[a]s a J.P. Morgan FX client, JPMorgan Chase Bank, N.A. would be your contractual counterparty.  As such, clients have the benefit of dealing with an entity recognized for its fortress balance sheet and preeminent credit position." (Emphasis supplied.)

both the firm and its clients" and would "reduce the costs" of such transactions.

It is also alleged that the Bank represented that it would conduct Indirect FX transactions in accordance with "best execution" practices.  The plaintiff alleges that the parties understood this to mean that the Bank would conduct "trading in such a manner that the client's total cost or proceeds in each transaction [was] the most favorable under the circumstances." In particular, LAMPERS points to two documents delivered in July 2007 and August 2010 -- after LAMPERS had enrolled in AutoFX -- which contained "important disclosures" of JPM's best execution obligations.  Both mailings describe an enactment of the Markets in Financial Instruments Directive ("MiFID") -- a European Union law governing transparency requirements for investment services -- and JPM's obligations thereunder.[5]  The mailings stated that "MiFID best execution rules require that firms take all reasonable steps to obtain the best possible results when executing orders on behalf of clients."  The disclosures also allegedly indicated that JPM's best-execution obligations applied to Indirect FX transactions by, for instance, stating that

---

[5] The Amended Complaint does not attach the mailings as exhibits, but the plaintiff has submitted them with its opposition to the defendants' motion to dismiss.

> [b]est execution is only owed when [JPM] accepts an
> order to execute a transaction on your behalf. . . .
> When [JPM] provides, quotes, or negotiates a price
> with you on request . . . it will not be receiving a
> 'client order' as part of a service where Best
> Execution will apply to determine the price given to
> you.  The distinction is between:
>
> Where you are relying on JPMorgan to get your best
> price, i.e., for JPMorgan to act on your behalf in
> protecting your interests, and
>
> Where you merely request or take a price.

Custodial customers of the Bank received monthly account statements from the Bank.  If the client had executed FX transactions, the account statement reflected the rate that the client was charged.  The monthly account statement did not, however, provide the rate at which the Bank itself had acquired the currency it provided to the client, nor did it include the time when that underlying trade was executed.

Custodial clients who were enrolled in AutoFX also received, by default, AutoFX Confirmations.  AutoFX Confirmations are trade confirmations that are automatically generated upon the commission of a transaction.[6]  In response to

---

[6] The Amended Complaint does not explicitly describe the information contained in these AutoFX Confirmations.  The Amended Complaint does, however, argue that because LAMPERS executed a "Suppress AutoFX Confirmations Form" it was "unable to review the automatically generated trade confirmations against the instructions issued for a given transaction" and instead, LAMPERS had to rely on the monthly account statements "which . . . do not break out any spreads charged from the actual FX rates paid."  The import of these allegations is that

the  defendants' encouragement, however, many custodial

customers -- including LAMPERS -- executed "Suppress AutoFX

Confirmations Forms."  LAMPERS executed this form on February

21, 2007.  If a customer executed the Suppress AutoFX

Confirmations Form, it no longer received the automatically

generated confirmation forms for its trades.

In January and February of 2011, two whistleblower actions

filed against the Bank of New York Mellon ("BNY Mellon") were

unsealed.  See Commonwealth of Virginia, ex. Rel. FX Analytics

v. The Bank of New York Mellon Corp., No. CL-2009-15377 (Va.

Cir. Unsealed Jan. 21, 2011); State of Florida, ex rel. FX

Analytics v. The Bank of New York Mellon Corp., No. 2009-CA-4140

(Fla. Cir. Unsealed Feb. 7, 2011).  These actions alleged that

BNY Mellon was charging undisclosed mark-ups for FX transactions

executed for its customers.  Following the unsealing, LAMPERS

performed its own "Currency Audit" of 1,542 FX transactions

executed by the defendants for LAMPERS and determined, as

described above, that the defendants were systematically

charging LAMPERS uncompetitive FX rates.  This law suit

followed.

LAMPERS filed its original complaint on August 30, 2012.

On November 5, the Case Management Order appointed LAMPERS as

---

the Confirmations did contain information that would have
allowed a custodial client to discern the spread.

lead plaintiff.  In accordance with the Case Management Order,
LAMPERS filed the Amended Complaint on January 17, 2013.  The
Amended Complaint includes five causes of action: (1) breach of
contract; (2) breach of fiduciary duty; (3) unjust enrichment;
(4) violation of New York General Business Law ("NYGBL") § 349
et seq; and (5) accounting.  The breach of contract claim is
brought against the Bank alone, while the other claims are
brought against both defendants.  On February 15, 2013, the
defendants filed a motion to dismiss the Amended Complaint in
its entirety.  The motion was fully submitted on March 29.  For
the reasons that follow, defendants' motion is granted.


DISCUSSION

     When deciding a motion to dismiss under Federal Rule of
Civil Procedure 12(b)(6), the court must "accept all allegations
in the complaint as true and draw all inferences in the non-
moving party's favor."  LaFaro v. New York Cardiothoracic Grp.,
PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted).  To
survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face."  Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009) (citation omitted).  The court is "not
bound to accept as true a legal conclusion couched as a factual
allegation."  Id. at 678.  Accordingly, a court may disregard

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id.

Applying the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

Although the focus should be on the pleadings in considering a motion to dismiss under Rule 12(b)(6), the court will deem the complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (citation omitted). Even if the plaintiff does not attach to the complaint or incorporate by reference "a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." Holowecki v. Fed. Express Corp., 440 F.3d 558, 565-66 (2d Cir. 2006) (citation omitted). The necessity of

transforming a Rule 12(b)(6) motion into a motion for summary
judgment is "largely dissipated" when the plaintiff is shown to
have had actual notice of the document extrinsic to the
complaint and to have relied upon the document to frame the
complaint.  Cortec Indus., Inc. v. Sum Holdings, L.P., 949 F.2d
42, 48 (2d Cir. 1991).   When a "complaint relies heavily upon
[the] terms and effect" of a document, such as a contract, it is
considered "integral" to the complaint.  Mangiafico, 471 F.3d at
398 (citation omitted).   In the event that a contract extrinsic
to the complaint is properly considered on a motion to dismiss,
a court is "not constrained to accept the allegations of the
complaint in respect of the construction of the [contract]."
Int'l Audiotext Network, Inc. v. American Tele. & Tele., 62 F.3d
69, 72 (2d Cir. 1995).   The court must, however, "strive to
resolve any contractual ambiguities in [the plaintiff's] favor."
Id.

I. Breach of Contract

     The Amended Complaint claims that the Bank breached the
Custody Agreement and the implied covenant of good faith by
charging undisclosed and non-agreed upon fees for the execution
of Indirect FX transactions.  The parties recognize that the
Custody Agreement adopts New York law and agree that New York
law applies to each of the claims asserted by LAMPERS.  See
Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir.

15

2000).  Under New York law, to establish a <u>prima facie</u> case for
breach of contract, a plaintiff must plead "(1) the existence of
an agreement, (2) adequate performance of the contract by the
plaintiff, (3) breach of contract by the defendant, and (4)
damages."  <u>Eternity Global Master Fund Ltd. v. Morgan Guar.
Trust Co. of N.Y.</u>, 375 F.3d 168, 177 (2d Cir. 2004) (citation
omitted).  The parties dispute centers on whether LAMPERS has
adequately alleged a breach of the Custody Agreement.

Under New York law, when a court interprets contract
language, its "primary objective is to give effect to the intent
of the parties as revealed by the language they chose to use."
<u>Seiden Assocs., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428
(2d Cir. 1992).  Consistent with this goal, words appearing in
the contract "should be given the meanings ordinarily ascribed
to them and absurd results should be avoided."  <u>Mastrovincenzo
v. City of New York</u>, 435 F.3d 78, 104 (2d Cir. 2006) (citation
omitted).  In cases where the parties' dispute rests on the
interpretation of a contract term, it is the court's role to
determine whether, as a matter of law, the term is ambiguous.
<u>Law Debenture Trust Co. v. Maverick Rube Corp.</u>, 595 F.3d 458,
465 (2d Cir. 2010).  A contract term is unambiguous where it
conveys "a definite and precise meaning, unattended by danger of
misconception in the purport of the contract itself, and
concerning which there is no reasonable basis for a difference

of opinion." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252
F.3d 608, 617 (2d Cir. 2001) (citation omitted).  A term is
ambiguous, on the other hand, when it is

> capable of more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated
> agreement and who is cognizant of the customs,
> practices, usages, and terminology as generally
> understood in the particular trade or business.

Id.  Ambiguity does not arise merely by virtue of the fact that
the parties volunteer different definitions.  See Law Debenture
Trust Co., 595 F.3d at 467.  For instance, the proposal of an
interpretation that "strains the contract language beyond its
reasonable and ordinary meaning" does not create ambiguity where
none otherwise exists.  Seiden Assocs., Inc., 959 F.2d at 428
(citation omitted).  Where contract language is unambiguous,
extrinsic evidence of the parties' subjective intent may not be
considered.  See Law Debenture Trust Co., 595 F.3d at 466.

The Amended Complaint alleges that the Bank's conduct
breached three provisions of the Custody Agreement: sections
2.15 (Foreign Exchange Transactions), 4.1 (Fees and Expenses),
and 7.1 (Standard of Care; Liability).  Because the alleged
breach of section 4.1 is at the heart of this action, the claim
regarding that section will be addressed first.

The Amended Complaint alleges that the Bank breached
section 4.1 of the Custody Agreement when it charged LAMPERS a

"fee" for Indirect FX transactions.  LAMPERS equates any spread

on the Indirect FX transactions the Bank executed for LAMPERS

with a "fee."  For ease of reference, the language of section

4.1 is repeated here:

> Customer will pay Bank for its <u>services hereunder the</u>
> <u>fees</u> set forth in Schedule A hereto or such other
> amounts as may be agreed upon in writing from time to
> time, together with Bank's reasonable out-of-pocket or
> incidental expenses, including, but not limited to,
> legal fees and tax or related fees incidental to
> processing by governmental authorities, issuers, or
> their agents.

(Emphasis supplied.)  Schedule A lists four categories of

services, none of which includes the execution of FX

transactions, but it does direct that "no transaction fees" will

be charged in connection with "custody and accounting" services.

LAMPERS does not argue that the ordinary meaning of "custody and

accounting," as that phrase appears in Schedule A, encompasses

FX services.[7]  But, the Custody Agreement itself uses the more

general term "services hereunder."  Thus, the issue is whether

the execution of FX transactions for the client is a service

under the Custody Agreement and whether the rate that the Bank

---

[7] LAMPERS does argue that the Custody Agreement nowhere suggests
that FX Services are "non-custodial services."  This misses the
point.  The mere fact that the services are delineated in the
Custody Agreement does not make them custodial services.
Indeed, as discussed below, in addition to custodial services,
the Custody Agreement expressly governs "settlement and certain
other associated services."  Thus, by the Custody Agreement's
own terms, a service can be a service under the Custody
Agreement without being a "custodial service."

listed on its monthly statements for each of these FX
transactions is a "fee" when that rate includes the spread on
the Indirect FX transactions.

The provision of FX trading services for a client
constitutes a "service" under the Custody Agreement.  As noted
above, the word "services" is not defined in the Custody
Agreement.  The word first appears in section 1.1, which
describes the "Intention of the Parties."  It provides that:

> this Agreement sets out the terms governing custodial,
> settlement and certain other associated services
> offered by Bank to Customer.

(Emphasis supplied.)  Among those "associated services" are the
facilitation of the administration of a client's trading and
investment activity through performance of the "spot or forward
foreign exchange contracts with Customer," as described in
section 2.15.

But, before proceeding to analyze whether a disclosed rate
is a fee, it is important to note several features of this
"service."  First, the contract did not require the Bank to
perform FX transactions.  Section 2.15 is explicit that the Bank
"may, but will not be obliged to" enter into such transactions.
Moreover, the same section also advises the client that the Bank
will be the counterparty in these transactions, and may choose
to provide the services through its affiliates or subcustodians.
As explained in section 7.4, the Bank is an institution that

provides diverse financial services which may generate a profit for the Bank.  Thus, while the performance of FX transactions for a client is broadly speaking a service that is offered under the contract, it is not a service that the Bank was required to perform to earn its yearly fee and it is a service in which the Bank stands on the opposite side of the transaction.

The next issue presented is whether section 4.1's reference to "fees" encompasses the rates for FX transactions reported to LAMPERS on its monthly account statements.  A fee is a "sum paid or charged for a service."  Merriam-Webster (2013).  An exchange rate is "the ratio for converting one country's money into another country's money."  Black's Law Dictionary (9th ed. 2009).[8]  These are two distinct concepts, and the plaintiff does not actually dispute that proposition.  Thus, it was not a breach of the Custody Agreement to reflect an exchange rate on the FX trading services that LAMPERS requested that the Bank perform.

---

[8] The National Futures Association defines a foreign exchange rate as "what it costs to exchange one country's currency for another country's currency."  National Futures Association, Trading Forex: What Investors Need to Know (2010).  The term has also been defined as "the quantity of one currency required to buy or sell a unit of the other currency," or the "relative value between two currencies."  Simmons, Automated Clearing House Transactions: Operations, Compliance, and Audit, Glossary of Terms (2013).  The Federal Reserve Bank of New York defines an exchange rate as "[t]he price of one currency in terms of another country's currency."  Federal Reserve Bank of New York, The Basics of Foreign Trade and Exchange (1993).

Of course, the plaintiff does not contend that no rate should have been reflected on its account statements, and that the inclusion of any rate constituted a "fee" that it was improperly charged.  It acknowledges that the exchange of one currency for another must be done at some rate.  LAMPERS has offered two theories, however, for why a different rate should have been used by the Bank on at least some transactions.

First, in its Amended Complaint, LAMPERS alleges that the Bank's disclosures of the MiFID regulations imposed upon the Bank the duty to use a "best execution" rate.  LAMPERS explains that such a duty required the Bank to use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resulting price to the customer is as favorable as possible under prevailing market conditions. See In re Bank of New York Mellon Corp. Forex Trans. Litig., No. 12-MD-2335 (LAK), 2013 WL 440628, at *10 (S.D.N.Y. Jan. 23, 2013) (relying on Financial Industry Regulatory Authority ("FINRA") Rule).  LAMPERS does not identify any provision in the Custody Agreement, however, that imposes such an obligation on the Bank.  Nor does LAMPERS contend that there is a "best execution" duty imposed in the United States generally when a bank acts as a principal in an FX transaction.

There are several reasons why the two disclosures regarding the MiFID regulations did not impose upon the Bank a contractual

duty to only reflect best execution rates in its monthly
statements.  First, the Custody Agreement contains an
integration clause.  It reads:

> This Agreement, including the Schedules, Exhibits, and
> Riders (and any separate agreement which Bank and
> Customer may enter into with respect to any Cash
> account), sets out the entire Agreement between the
> parties in connection with the subject matter, and
> this Agreement supersedes any other agreement,
> statement, or representation relating to custody,
> whether oral or written.  Amendments must be in
> writing and signed by both parties.

In light of the integration clause, there is no basis to find
that the "best execution" standard described in the MiFID
disclosures was incorporated into the Custody Agreement.

LAMPERS responds, however, that even if the MiFID
disclosures were not incorporated into the contract, they
constitute extrinsic evidence that is admissible to interpret
the parties' intent with respect to ambiguous contract language.
But, in the absence of an ambiguity in the meaning of the word
"fee" such that it could be understood to include the exchange
rate in these circumstances, it would be improper to use parol
or extrinsic evidence to alter the ordinary meaning of the term
fee.  In any event, these documents, to the extent they are
described in the Amended Complaint, do not shed light on the
meaning of the term fee in the Custody Agreement.  Moreover, the
MiFID regulations are European regulations, and there is no
basis to find that they imposed any legal obligation in a

22

contract that is to be interpreted under New York law, even if some of the transactions that the Bank performed for LAMPERS were performed in Europe.  Thus, the contract did not impose upon the Bank an obligation to perform trades at the best execution rates when executing Indirect FX transactions with the plaintiff.

Second, LAMPERS argues that the implied duty of good faith and fair dealing imposed upon the Bank the obligation to avoid any "secret" mark-up of FX rates.  It contends that any FX transactions that the Bank performed for the plaintiff had to be performed for the flat annual fee negotiated between the parties.  According to LAMPERS, interpreting the contract in this fashion would do no more than hold the Bank liable for failing to meet LAMPERS "reasonable expectations" that the Bank would not misrepresent FX rates.  Relying on JPMorgan Chase Bank, N.A. v. IDW Group, LLC, No. 08-9166 (PGG), 2009 WL 321222, at *8 (S.D.N.Y. Feb. 9, 2009) ("Chase"), and International Union v. Bank of New York Mellon Corp., No. 11-3620 (WHA), 2012 WL 476526, at *6 (N.D. Calif. Feb. 14, 2012) ("BNYM"), the plaintiff contends that courts recognize that the concealment of information reasonably expected to be disclosed constitutes a breach of the convenant of good faith and fair dealing.

This second theory of liability is no more successful. Under New York law, "[t]he implied covenant of good faith and

23

fair dealing prevents any party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Gaia House Mezz LLC v. State Street bank and Trust and Co., -- F.3d --, 2013 WL 2500579, *6 (2d Cir. June 12, 2013) (citation omitted). "In order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." Id. (citation omitted). In addition, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Cruz v. FXDirectDealer, LLC, -- F.3d --, 2013 WL 3021904, at *8 (2d Cir. 2013).

For the reasons already explained, rates for FX transactions are not fees, and therefore the rates disclosed by the Bank to LAMPERS do not constitute "fees," as that term is used in the Custody Agreement. To the extent that plaintiff's breach of the implied covenant of good faith claim is premised on the same conduct alleged to constitute a breach of the Custody, it must be dismissed as redundant. The claim additionally fails because the Amended Complaint identifies no way in which the Bank's conduct "directly violate[d] an obligation that may be presumed to have been intended by the

parties." Gaia House Mezz LLC, 2013 WL 2500579, at *6 (citation omitted).

LAMPERS claims it had a reasonable expectation that the Bank would not misrepresent FX rates, but this contention misses the point on several grounds. The Bank did not misrepresent the rates for the FX transactions. It is conceded that the rates JPMorgan charged were accurately reflected on monthly account statements. LAMPERS identifies no foundation for its "reasonable expectation" that, in addition to reporting the charged exchange rate, JPMorgan would also reveal its mark-up on the Indirect FX transactions.

In any event, because the spreads were evident from the AutoFX Confirmations and publicly available databases, there was nothing secret about the mark-ups. The two decisions cited by LAMPERS do not suggest otherwise. In Chase, the defendant IDW -- an executive search firm -- was retained by JPMorgan to "provide advice and assistance in obtaining for JPMorgan's benefit the best and most qualified talent in the financial services industry." Chase, 2009 WL 321222, at *6. IDW failed to disclose that it had also been retained to actively solicit "one of JPMorgan's most senior and valued executives" on behalf of one of JPMorgan's competitors. Id. (citation omitted). As the court in Chase recognized, while the written agreements did not require such disclosure, a jury could reasonably find that

IDW's decision to assist JPMorgan's competitor in luring away
one of JPMorgan's top executives, was incompatible with its
obligations to JPMorgan under their agreements.  LAMPERS has
identified no way in which JPMorgan's failure to disclose its
spread on Indirect FX transactions would similarly deprive
LAMPERS of the "fruits" of the Custody Agreement.  BNYM, 2012 WL
476526, although more supportive of LAMPERS' position, does not
indicate how the Bank's non-disclosure of the spread in the FX
transactions had "the effect of destroying or injuring the right
of the other party to receive the fruits of the contract."  Gaia
House Mezz LLC, 2013 WL 2500579, at *6 (citation omitted).  The
Court therefore declines to follow BNYM.

    At its heart, this action is premised on a
mischaracterization of foreign exchange transactions.  In such
transactions, one currency is sold in return for the purchase of
the other.  See Eun et al., International Financial Management,
The Market for Foreign Exchange, 74 (3d ed. 2004).  Through
execution of the trade, the purchasing power of the buyer's
country is converted into the purchasing power of the seller's
country.  Cf. Vishipico Line v. Chase Manhattan Bank, N.A., 754
F.2d 452, 455 (2d Cir. 1985).  The relative purchasing powers
are expressed as ratios of one currency to another.  The foreign
exchange market in which the transactions occur is a
decentralized or over-the-counter market, which means there is

no central location for buyers and sellers of currencies to do business.  Due to the decentralized nature of the market, at any given time there is no single price for currencies.  <u>See</u> Lemke et al., Soft Dollars and Other Trading Activities, § 1:57 Trading and Execution: A Primer -- Foreign Exchange Markets (2012).

The market is also two-tiered in that it encompasses two markets -- the interbank or wholesale market and the retail market.  International banks make up the majority of participants in the interbank or wholesale market, whereas their customers traditionally operate in the retail market.  <u>See</u> Eun et al., International Financial Management, The Market for Foreign Exchange, 76 (3d ed. 2004).  The prices of currency or -- in other words -- the exchange rates in the wholesale and retail markets differ.

As the Seventh Circuit explained in <u>In re Mexico Money Transfer Litigation</u>:

> Money is just a commodity in an international market.
> Pesos are for sale -- at one price for those who buy
> in bulk (parcels of $5 million or more) and at
> another, higher price for those who buy at retail and
> must compensate the middlemen for the expense of
> holding an inventory, providing retail outlets,
> keeping records, ensuring that the recipient is the
> one designated by the sender, and so on.  Neiman
> Marcus does not tell customers what it paid for the
> clothes they buy, nor need an auto dealer reveal
> rebates and incentives it receives to sell cars.  This
> is true in financial markets no less than markets for
> physical goods.  The customer of a bank's foreign-

exchange section (or an airport's currency kiosk) is
quoted a retail rate, not a wholesale rate, and must
turn to the newspapers or the Internet to determine
how much the bank has marked up its Swiss Francs or
Indian Rupees.

In re Mexico Money Litig., 267 F.3d 743, 749 (7th Cir. 2001).

Thus, while there may be spreads between FX transactions, the

exchange rate a Bank charges its customers is more naturally

characterized as the price of the commodity the customer has

chosen to purchase, rather than a fee for the provision of

services.

The Custody Agreement is fully consistent with this

understanding of foreign exchange transactions.  In the Custody

Agreement, the parties recognize that the Bank "may" enter a

foreign exchange transaction "with Customer" in order to

"facilitate" the administration of the customer's trading and

investment activity.  There was no requirement that the customer

use the Bank for these exchange activities or requirement that

the Bank agree to do so for the customer.  If the customer does

choose to use the Bank for the FX Exchange activities, however,

the transaction was one between the Bank and the customer, in

which the Bank was free to sell or buy a currency at any rate.

The contract imported no requirement that the rate be the best

available market rate, the rate at which the Bank had originally

procured the currency that it bought or sold to the customer, or

any other particular measure.

28

The client had several ways to protect itself from the Bank
selecting an unreasonable rate.  First, as recognized in section
2.15, the parties could enter into a "master foreign exchange
contract" that would set the terms and conditions for the
transactions.  Second, the client could give the Bank
"Instructions, including standing Instructions" for the
transactions.  Third, the client had the right to receive
Confirmations for each transaction.  Fourth, the monthly account
statement identified the rates at which the Bank was recording
the exchange transactions for LAMPERS' account and public
information from the Reuters database would reveal whether those
disclosed rates were or were not within the range of reasonable
rates for those currencies at that period of time.

For many years, LAMPERS has chosen to rely on this fourth
method, and indeed has relied on the Reuters database in
formulating its allegations against the Bank.  Having concluded
that it is no longer satisfied with the rates reported by the
Bank, the plaintiff cannot claim that the FX transaction rates
are now fees and that it should not have been "charged" some
portion of those "fees."

LAMPERS' breach of contract claim rests, as well, on
sections 2.15 and 7.1 of the Custody Agreement.  Neither of
these provisions, however, can bear the weight that LAMPERS
assigns to them.

Section 2.15, entitled "Foreign Exchange Transactions,"
provides that the "Bank may, but will not be obliged to, enter
into spot or forward foreign exchange contracts with Customer,
or an Authorized Person, and may also provide foreign exchange
contracts and facilities through its Affiliates or
Subcustodians."  As discussed above, nothing in the language of
this section imposes an obligation on the Bank to execute
Indirect FX transactions with its customers at a particular
rate.  Indeed, the provision is emphatic that the Bank has no
obligation to perform FX transactions at all.

Section 7.1, entitled "Standard of Care; Liability," is
similarly unavailing.  It reads, in part:

> (a) Bank will use reasonable care in performing its
> obligations under this Agreement.  Banks will not be
> in violation of this Agreement with respect to any
> matter as to which it has satisfied its obligation of
> reasonable care. . . .

The Amended Complaint alleges that section 7.1's "reasonable
care" standard obligated the Bank to price FX trades in a manner
that was not "designed to extract substantial and secret
profits" and to "adequately describe[e]" the AutoFX program to
its customers.  But plaintiff's argument finds no support in the
language of section 7.1.  By its own terms, section 7.1 merely
requires the Bank to exercise reasonable care in the execution
of the obligations already created under the Custody Agreement.
Because the Custody Agreement nowhere requires the Bank to

execute FX transactions at a particular exchange rate or to
describe the AutoFX program to customers, section 7.1's
reasonable care standard cannot support a breach of contract
claim premised on the Bank's failure to take such actions.

## II. Breach of Fiduciary Duty

The plaintiff claims that the defendants breached fiduciary
duties that they owed to the plaintiff when they charged
exchange rates that were less favorable than the rates at which
the defendants had executed the Indirect FX transactions, and
kept the spread for themselves.  To state a claim for breach of
fiduciary duty under New York law, a plaintiff must allege "(1)
the existence of a duty on defendant's part as to plaintiff; (2)
a breach of this duty; and (3) injury to the plaintiff as a
result thereof."  Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111,
114 (2d Cir. 2000) (citation omitted).  "A fiduciary
relationship exists between two persons when one of them is
under a duty to act for or to give advice for the benefit of
another upon matters within the scope of the relation."  AG
Capital Funding Partners v. State Street Bank & Trust, 11 N.Y.3d
146, 158 (2008) (citation omitted).  Essential elements of any
fiduciary relationship are "reliance, de facto control and
dominance."  Id. (citation omitted).  "When parties deal at arms
length in a commercial transaction, no relation of confidence or
trust sufficient to find the existence of a fiduciary

relationship will arise absent extraordinary circumstances." In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002).  To determine whether a fiduciary duty exists between parties, courts consider any contract that exists between the parties as well as the nature of the parties' relationship.  Northeast Gen. Corp. v. Wellington Adver., Inc., 82 N.Y.2d 158, 162 (1993).

LAMPERS has failed to allege facts sufficient to plausibly plead a breach of a fiduciary duty by the defendants.  First and foremost, the relationship between the Bank and LAMPERS is indisputably one of a bank and its customer.  Transactions between a bank and its customers do not, without more, give rise to a fiduciary relationship.[9]  Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993).

As significantly, the parties' Custody Agreement contains several terms that are at odds with a finding that a fiduciary relationship existed.  In the section of the Custody Agreement laying out the intention of the parties, custodial customers expressly acknowledge that the "bank is not providing any legal, tax or investment advice in connection with the services hereunder."  Elsewhere in the agreement, the Bank warns that it

---

[9] LAMPERS asserts that JPM's fiduciary obligation arose because it was an agent of the Bank's custodial customers.  Because the plaintiff has not adequately pleaded the existence of a fiduciary relationship between the Bank and plaintiff, its claim that a fiduciary relationship existed with the Bank's parent necessarily fails.

"provides diverse financial services and may generate profits as a result," and that the Bank "or its Affiliates may be in possession of information tending to show that the Instructions received may not be in the best interests of Customer but that [the] Bank is not under any duty to disclose any such information." Furthermore, the contract does not, despite plaintiff's conclusory statement to the contrary, accord the Bank discretion over custodial clients' assets. See Subaru Distribs. Corp. v. Subaru of America, Inc., 425 F.3d 119, 122 (2d Cir. 2005). The areas in which the Bank is granted discretion are actually few and are carefully delineated. Nor does the section expressly devoted to FX transactions use language implying the existence of a fiduciary duty.

Other hallmarks of a fiduciary relationship are also absent. There is no basis to find from the allegations in the Amended Complaint and the documents integral to it that the Bank provided advice to the plaintiff, had de facto control over the use of its assets, dominated their relationship or had a relationship of confidence or trust with the plaintiff. There are no allegations, for instance, that defendants acted in an advisory role, that the parties had a long-standing or personal relationship, or that plaintiff was especially vulnerable. See, e.g., de Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d

33

1293, 1308-09 (2d Cir. 2002); EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 21-22 (2005).

In the absence of a fiduciary relationship, the Bank's alleged practice of charging exchange rates that were "inconsistent with the rates paid by the Defendants, or with the actual rates prevailing at the time the FX trades was executed" cannot constitute a breach of a fiduciary duty. Accordingly, the plaintiff fails to state a plausible claim for breach of a fiduciary duty.

The plaintiff identifies three reasons for finding that a fiduciary duty existed. First, it claims that because the Bank is a "custodian" with substantial control over custodial clients' assets and discretion in the management of those assets it owed a fiduciary duty to those clients. Second, it alleges that the Custody Agreement itself imposed a fiduciary duty on the Bank in connection with FX transactions. Finally, it alleges that the defendants' representations in connection with the AutoFX program and the nature of that program imposed fiduciary duties on the defendants.

None of these circumstances are sufficient to allege the existence of a fiduciary relationship between the defendants and LAMPERS. The relationship of a custodial bank to its client is one of depositor and customer, a relation that does not, without more, give rise to a fiduciary duty. See Nathan v. J & I

34

Enters., Ltd., 622 N.Y.S.2d 798, 798 (2d Dep't 1995).  The
conclusory allegation that the Bank had substantial discretion
in connection with clients' assets is also unsupported by
factual allegations, and contradicted by the Custody Agreement.

Next, the Custody Agreement does not create a fiduciary
relationship between the Bank and the custodial clients, for all
the reasons identified above.  No facts are alleged to suggest
that the Custody Agreement was anything other than an arm's
length transaction.  In addition, none of the Agreement's terms
suggest that the parties' relationship was "grounded in a higher
level of trust than normally present in the marketplace between
those involved in arm's length business transactions." EBC I,
799 N.Y.3d at 19.  Where, as here, parties to a contract "do not
create their own relationship of higher trust, courts should not
ordinarily transport them to the higher realm of relationship
and fashion the stricter duty for them." Oddo Asset Mgm't v.
Barclays Bank PLC, 19 N.Y.3d. 584, 593 (2012) (citation
omitted).

The plaintiff's final ground for asserting the existence of
a fiduciary relationship between the parties relies on the
nature of the AutoFX program and the Bank's representations
about the program.  In essence, the plaintiff claims that a
fiduciary relationship was created between the parties because
(1) the nature of the AutoFX program meant that the plaintiff

35

depended on the Bank to obtain the best rate for the plaintiff;
(2) the Bank had superior access to allegedly confidential
information; and (3) the defendants made representations to
custodial clients about their business ethics, their expertise,
the benefits of their AutoFX program, and their best execution
obligations.  None of these allegations plausibly suggests that
the defendants were fiduciaries of the plaintiff.

First, there is often some level of dependency between
counterparties to a business transaction that does not itself
give rise to a fiduciary relationship.  See Legend Autorama,
Ltd. v. Audi of Am., Inc., 954 N.Y.S.2d 141, 144 (2d Dep't
2012).  In addition, to characterize the plaintiff as dependent
ignores all of the ways in which the plaintiff was able to act
independently.  The Amended Complaint acknowledges that
custodial customers were at liberty to execute direct FX
transactions with the Bank.  In other words, LAMPERS could have
negotiated an exchange rate for each of its trades.  There is no
allegation that custodial customers were required to execute any
FX transactions through the AutoFX program.  Indeed there is no
allegation that custodial clients were required to conduct any
FX transactions of any kind with the Bank.  In addition, the
Amended Complaint acknowledges that the Indirect FX transactions
were executed at the direction of the plaintiff's Standing
Instructions.  Thus, taking the allegations of the Amended

Complaint as true, no inference can be drawn that the plaintiff was dependent on defendants to obtain the best exchange rate possible.

Plaintiff's allegation that the defendants had superior access to confidential information about the rate at which they executed FX transactions is also contradicted in a number of ways by the Amended Complaint.  While one party's superior knowledge of pertinent information sometimes creates a fiduciary relationship, "a party's knowledge is not superior where the relevant information 'was either a matter of public record, was not pursued by the plaintiff[], or was disclosed at least in part.'"  Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.3d 729, 739 (2d Cir. 1984).  These principles are particularly apt here.  First, the Amended Complaint contains a "Currency Audit" of FX transactions executed between LAMPERS and the Bank between roughly January 2, 2007 and December 31, 2008, suggesting that there is nothing confidential about the range of market prices available for FX transactions.  See In re Bank of New York Mellon Corp. Forex Trans. Litig., 2013 WL 440628, at *16.  As the Amended Complaint acknowledges, information on the daily prevailing market rates for currencies is available from "a Reuters-sponsored database that is widely accepted in the FX market as an accurate and reliable source of pricing information."

Second, the Amended Complaint acknowledges that -- unless a customer executed a "Suppress AutoFX Confirmations Form" -- the customer received automatic trade confirmations that would have allowed the customer to discern the spread.  The Director of LAMPERS executed this form on February 21, 2007.  Thus, to the extent that the plaintiff faced greater barriers to identifying the defendant's spread, these barriers were self-inflicted. Neither the defendants' "encouragement" to execute the forms, nor a customer's regret for having signed the form, justifies the retroactive creation of a fiduciary relationship where none originally existed.

Third, the Amended Complaint also acknowledges -- as does the Custody Agreement -- that a customer could contact the Bank to negotiate an exchange rate for any trade it desired to make. Thus, if the plaintiff wanted to ascertain available rates, it could have done so by negotiating directly with the Bank.

The defendants' representations about the benefits of the AutoFX program, their own expertise, or their best execution obligations are also insufficient to suggest the existence of extraordinary circumstances that would have converted the parties' business relationship into a relationship of higher trust.  The defendants' statements fail to suggest that they had a duty to act for or to give advice to the plaintiff.  Cf. Johnson v. Priceline.com, Inc., 711 F.3d 271, 279 (2d Cir. 2013)

(applying Connecticut law).  Indeed, the very representations
from defendants' website on which the plaintiff relies in its
Amended Complaint appear alongside the express statement that
the Bank would be acting as a "counterparty" in any FX
transactions with customers.

In addition, in the absence of factual allegations
suggesting that the defendants' exercised de facto control over
the plaintiff's assets and dominance over the plaintiff, the
defendant's representations that they would execute certain
transactions in a manner designed to ensure the best possible
results for their clients is insufficient to create a fiduciary
relationship between the parties.  In sum, the plaintiff has
failed to state a claim for breach of a fiduciary duty against
the defendants.

III. Unjust Enrichment

The Amended Complaint also claims that the defendants were
unjustly enriched by their "unlawful acts, omissions and
breaches of fiduciary duties."  To state a claim for unjust
enrichment the plaintiff must allege "(1) that the defendant
benefited; (2) at the plaintiff's expense; and (3) that equity
and good conscience require restitution."  Beth Israel Med. Ctr.
V. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573,
586 (2d Cir. 2006) (applying New York law).

> Unjust enrichment is not a catchall cause of action to be used when others fail.  It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. . . . An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).

The Amended Complaint has not identified a basis on which restitution could be required.

To the extent LAMPERS argues that the Custody Agreement obligated the Bank to provide Indirect FX transactions at cost, this claim is merely duplicative of the plaintiff's contract claim and cannot survive.  To the extent the plaintiff's contract claim fails, the plaintiff must identify some other basis on which restitution can be founded.  There is no inherent reason why there may not be a spread between FX transactions. In re Mexico Money, 267 F.3d at 749.  Instead of offering a factual basis for restitution, the Amended Complaint merely recites the elements of a claim for unjust enrichment without linking those elements to facts that could support them.  As such, the plaintiff has failed to state a claim for unjust enrichment.  Iqbal, 556 U.S. at 678.

IV. Violation of NYGBL § 349

Section 349 of NYGBL declares unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or

40

in the furnishing of any service" in New York State.  N.Y.
Gen.Bus.L. § 349.  "To maintain a cause of action under § 349, a
plaintiff must show: (1) that the defendant's conduct is
consumer-oriented; (2) that the defendant is engaged in a
deceptive act or practice; and (3) that the plaintiff was
injured by this practice."  Wilson v. Northwestern Mut. Ins.
Co., 625 F.3d 54, 64 (2d Cir. 2010).  In addition, to have
standing to bring a NYGBL § 349 claim, a plaintiff must satisfy
a territoriality requirement that focuses on "the strength of
New York's connection to the allegedly deceptive transaction,
rather than 'on the residency of the parties.'"  Cruz, 2013 WL
3021904, at *5.

        "The gravamen of a § 349 claim is consumer injury or harm
to the public interest."  City of New York v. Smokes-
Spirits.com, Inc., 541 F.3d 425, 455 (2d Cir. 2008).  The
"consumer-oriented" requirement may be satisfied by showing that
the conduct at issue "potentially affects similarly situated
consumers."  Wilson, 625 F.3d at 64.  "Although consumer-
oriented conduct does not require a repetition or pattern of
deceptive conduct, a plaintiff must demonstrate that the acts or
practices have a broader impact on consumers at large."  Id.  In
other words, private contract disputes that are "unique to the
parties . . . would not fall within the ambit of the statute."

                                  41

Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995).

The NYGBL § 349 claim fails because the Amended Complaint fails to adequately allege that the defendants' conduct was consumer-oriented.  It is true, as the plaintiff points out, that business-to-business transactions can involve the kinds of consumer-oriented practices with which § 349 is concerned.  See Oswego, 85 N.Y.2d at 26.  It distorts the law beyond recognition, however, to suggest that an ancillary service that is provided in connection with a contract for custodial banking services offered to institutional investors and that explicitly gives clients the option to negotiate specific rates or to issue "Standing Instructions" for automated FX transactions is a "consumer-oriented" service.[10]

The recent decision in Cruz, 2013 WL 3021904, is not to the contrary.  In Cruz the consumer-orientation requirement of NYGBL § 349 was not addressed.  Id., 2013 WL 3021904, at *5-*6.  But, assuming the "online foreign currency exchange trading" services described therein were consumer-oriented, they are distinguishable from the services at issue here.  Id., 2013 WL 3021904, at *1.  In the present case, JPMorgan is alleged to provide custodial services to institutional investors.  In

---

[10] To the extent the decision in BNYM, 2012 WL 476526, at *6-*7, reaches the opposite conclusion in a factually similar context, this Court declines to adopt its reasoning.

42

connection with those services, it offers, to the same customers, ancillary FX services, which include the AutoFX program.  The Amended Complaint nowhere alleges that these services are offered to a wider consumer-base, or that they are otherwise likely to "have a broader impact on consumers at large." <u>Wilson</u>, 625 F.3d at 64.  Accordingly, the Amended Complaint fails to state a claim under NYGBL § 349.

V. Accounting

Under New York law, an accounting is an equitable remedy that requires the existence of a fiduciary relationship, a joint venture, or other special circumstances between the plaintiff and the defendants warranting equitable relief.  <u>Weisman v. Awnair Corp. of Am.</u>, 3 N.Y.2d 444, 450 (1957).  Because the plaintiff has failed to adequately allege the existence of a fiduciary relationship between the parties and does not otherwise allege a special or confidential relationship, the claim for an accounting must fail as well.

CONCLUSION

The defendants' February 15 motion to dismiss the Amended Complaint is granted.  The Clerk of Court shall close the case.


SO ORDERED

Dated:    New York, New York
          July 3, 2013



_____
          DENISE COTE
    United States District Judge